Good afternoon, Your Honor. If it pleases the court, I'm Edward McIntyre. I'm here on, I apologize, I'm here on behalf of Daw Industries. I would like to save maybe four minutes at the end to comment. Just keep track of your time.  At least for purposes of this case, this panel is sitting effectively as a surrogate California Supreme Court deciding, applying substantive California law, either as that court has applied it, or if it hasn't yet, predicting where it's going to go. We do that all the time. That's the substantive jurisprudential prism we're using. Obviously, Federal Rule 56 is the procedural jurisprudential prism. In that context, I respectfully submit that the district court made subtle but regrettably critical errors in this case, and I'd like to address three points. The first being the conspiracy and restraint of trade under the Cartwright Act, Business Professions Code 16-720. The elements are laid out by the California Supreme Court probably most succinctly in the Quillemaine case, three elements. You need a conspiracy, you need acts in furtherance of the conspiracy, you need resulting damage coming from the anti-competitive acts. Here, the district court found that we were able to establish material issues of fact, one, on a conspiracy, usually the toughest thing to establish. The district court found there was a material issue of fact that there was a conspiracy between Hanger on the one hand and Odebock on the other. Two, we established anti-competitive injury, which also is frequently a tough thing to establish. So why are we here? We're here, at least on this particular element, for two reasons. One, the district court regrettably imposed an element that the California Supreme Court has never imposed on a case like this, nor I respectfully submit it never would. Two, the court, for whatever reason, never even discussed one of the three Quillemaine elements, namely wrongful conduct. Let me come to the element that the court imposed. It said that Daw had to show substantially adverse effect on competition in the relevant market. Well, that's what Fisherman's Wharf case says you have to show, correct? Precisely, Your Honor, and that's exactly where the court got it from. And if the court, if this court looks at the Fisherman's Wharf opinion, starting at page 334, they're talking, that opinion is talking about exclusive dealing, which is analyzed on a, as a vertical non-price restraint. So are you saying that what happened here is a per se violation? Is that your position? No, Your Honor, I'm not. It's not? I'm not saying it is a per se violation, but I'm saying it is not a vertical non-price restraint. This conduct is horizontal. Hanger and Daw are at the same levels of competition. Because Hanger is essentially a wholesale outlet and Daw is partly that? Is that why? Daw sells to prosthetists, Hanger sells to prosthetists, including its own prosthetists. So we are at, this is horizontal, it is not vertical. Consequently, the whole analysis there, the use of So your position is that with regard to a horizontal conspiracy, there doesn't have to be any effect on anti-competitive impact. So what is the impact? No, no, no. Just an injury, just if you injure the particular plaintiff, that's good enough? No, it's not, Your Honor. Let me come to that. Because what the Quillomane case says, as distinguished from what's in Fisherman's work, Quillomane also says that you have to show a purpose to restrain trade. That's in Quillomane. That's the California Supreme Court. And then that court goes on to say, unless another purpose for the defendant's action appears, a court may infer a purpose to act in restraint of trade from allegations describing the effect of the combination. But no California court has imposed in a non-vertical, non-price restraint case, the standard that the district court imposed here, taking it wholesale out of Fisherman's work, namely substantially adverse effect on competition in the relevant market. So all you have to prove is a purpose to do that? Not that it happened? Is that your position? Purpose to restrain trade as opposed to the formulation that you have in Fisherman's work, which is, again, to come back to restrain, I'm sorry, effect on competition in the relevant market. Well, what does restrain trade mean, then? Well, let's take it in this particular case, because this is the case we're talking about. How is trade restrained here, let's say, from mid-2003 through 2006, the period of the Conscription? It's trade that has to be restrained, not that the plaintiff has to be negatively impacted, right? So why isn't that the same? Well, no. The plaintiff also has to be negatively impacted. Also. That's the third inequality. I'm trying to understand whether your argument is that there does not have to be any showing of impact on competition in a relevant market. Is that what you're arguing? There does not have to be that? For this particular part. So what does there have to be? What does it mean to restrain trade if it doesn't mean that? No. What it means, Your Honor, is that trade in the particular market is going to be impacted by the anti-competitive conduct. But it doesn't have to be substantive. What is the distinction and what is to draw from the Fisherman's Wharf standard and whatever standard you're advocating for? Okay. The standard I'm advocating is the standard that was set forth in Qualamate. Okay. Okay. Which was, in addition to the three that I ticked off, okay, purpose to restrain trade. Okay. So I'm trying to find out in this context what does restrain trade mean? Okay. We're looking then at the purpose of the competitors to restrain trade. Okay. Which can be inferred from their conduct according to Qualamate. But, well, you're evading what I'm trying to. I'm sorry. I'm not understanding, I guess. All right. Okay. The Fisherman's Wharf standard is essentially a definition of what it means to restrain trade, right? To substantially affect, to have a substantial anti-competitive effect in a defined market. That's restraining trade. In the relevant market. That's correct. All right. That's one kind of restraining trade. What's another kind of restraining trade? What are you trying to say this restraining trade is, that it's not that restraining trade? What does it mean? The market, I respectfully submit, the market analysis in Fisherman's Wharf, exclusive dealing analysis, which is what one was talking about in this particular part of that opinion, is different than the horizontal. Okay. So what is it that we're supposed to be doing in this context that goes beyond just the inarticulate words restraining trade? What are we looking for? What we are looking for is a lessening of competition in a particular marketplace, which is what we have. How is that different than the Fisherman's Wharf standard? Because if you look at what you had in Fisherman's Wharf, you had blue and gold using an exclusive. I understand it may come out differently because you're looking at a different kind of restraint, but the ultimate standard is the same, isn't it? You need a conspiracy, wrongful acts, and damages. And you need a conspiracy to do what? A conspiracy to restrain trade. What is restraining trade? It's to cause a substantial anti-competitive effect in a relevant market, no? Yeah. There is a difference. I respectfully submit, Your Honor. And, in fact, the district court tried to articulate that difference because what the court went on to say is at a purpose. Difference as to what? You know, can I tell you something? We could save money if we had folks like you here every day get rid of all these PA systems that don't work. You speak louder. So you're restraining. Go ahead. I'm sorry, Your Honor. No, no, I like it. Go ahead. Yeah. I just am missing your point because I don't understand what you're trying to say is in the substantive standard. I understand how you then apply it depends on exactly what the restraint is. But what you're looking for is ultimately the same, no? Either I'm missing your question or the answer is no, it is not, Your Honor, because it is different. When you're talking about vertical restraint, which is what we have in Fisherman's Wharf, versus the horizontal impact. All right. I guess I'm going to have to let go because I've asked the question five times. Aren't you? Isn't the essence of your argument that you're attempting to impose a rule that any time that there's an injury to any competitor, that that's a restraint of trade without showing that it has any effect on the market? Because you use the term lessening of competition. Isn't that the rule you're arguing for? And isn't that not a restraint of trade as the cases look at it? That's not the rule I'm arguing for because the quantum aid decision also adds, because we're talking about anti-competitive conduct, that the purpose has to be to restrain trade. But is that a violation? That if you act with a purpose to restrain trade but you don't actually have any substantial effect on competition, you're still, it's still a cart ride violation? Is that your position? That's my position because that's. So it's your intent, even if it doesn't work? Yes, Your Honor, because in its wisdom, our legislature in 1907 rolled Sherman 1, Sherman 2, and Clayton all into the words that are found in the Cartwright Act. It doesn't distinguish. All it outlaws is a combination or conspiracy to restrain trade. All the rest of the embellishments have been by the California Supreme Court. But the restrain trade, it has an understanding of those, that term is set forth in Sherman Act cases and Cartwright Act cases. You seem to just be saying restrain of trade equals anything bad that happens to a competitor. And that's not what the standard is. No, I'm not, Your Honor, because I think it is reasonably clear under, even under California law, that the purpose of the Cartwright Act is not just to protect competitors. It is also to protect competition within whatever. All right. Tell me how all this makes any difference on this record. Pardon? How does this make a difference on this record? My understanding is that the district court thought that the record did not establish any anti-competitive effect on any defined market, both because you hadn't defined the market and also because there were actually people coming into the market. And while your clients may have been disadvantaged for a relatively short while, there were other people manufacturing similar prosthetic legs who were coming into the market. So and not only that, it wasn't clear whether the market was the market for prosthetic legs in general or some specific subset of prosthetic legs. And you're saying all that's irrelevant? I mean, what are you saying? Let me address your questions in back order. The market is very clearly defined. It's microprocessor knees for above-the-knee amputees. That's the market. That's the only thing anybody's talking about. Ottobock has a C-leg. We have the SLK. Enderleicht had its. The period of time. Well, that's one way to look at the market. Another one would be to look at prosthesis in general of that kind and say because some people might buy one that is a microprocessor and other people might buy one that isn't a microprocessor, but they're competing with each other. No, but that's not the market that the competition in the market that we're talking about here. We're not talking about anything from crutches to stick legs. Do you have an expert who testified to that? The market as the competition itself was defining it, starting from the AOPA meeting that defined at the request of the Veterans Administration that defined what constitutes a microprocessor knee defined the very market. Do you have an expert to testify to that? Testify to that point? No, Your Honor. Okay. Do you have an expert to testify to anything? As a matter of fact, no. That's what I thought. Yes. Because the facts themselves define the market, because that was the question that the Veterans Administration put to first the Academy and then to AOPA. What is a microprocessor knee? All right, but I don't see why that necessarily defines the economic market. Because the economic market flows out from those prosthetists who are going to use and prescribe microprocessor knees as opposed to anything else. The competition here is not between crutches and a microprocessor knee or a stiff leg knee or anything else. The competition is between the manufacturers or distributors of microprocessor knees. That's the competition. With respect to other entrants into the market, excuse me, Hanger itself admitted that from 2001 up through 2005, this came from Berry, a document that he created. It's Exhibit 4 to his deposition. It's in the record. There were only three microprocessor knees in the market. There was the Autobaxi leg. There was ours, the SLK. And there was the Enderlein. The other competition did not. And I thought the events that you're complaining of occurred when? 2003, mid-2003. So it was 2003 up through the time we filed the lawsuit in 2006. Okay. And during that, so isn't the relevant question whether there were entrants in the market during that period? Yes, and the new entrants into the market did not come until 2005. Okay. So from 2003 up through 2005. But the question was whether there was a barrier to entry to the market. Pardon me? The issue was whether there was a barrier to competition as a result. No, this is not a monopolization case, Your Honor. I'm sorry, what? This is not a monopolization case. I thought we made that clear. We are not appealing the district court's decision on monopolization. I understand. It's an attempt to monopolize case. Okay. Okay. To come to Judge Amon's point before. And what actually happened isn't of any relevance to what was attempted to happen? I'm sorry, I'm not understanding your question. Excuse me. What actually happened is somewhat informative as to what the attempt was, no? Of course. Right. What in fact happened was in fact the fruit of what was intended to happen. California Supreme Court first did Texaco, but it's been reiterated since. The one, there is no Sherman 2 component in the Cartwright Act. You know, as there is in Sherman 2. That's perfectly clear. Sherman 2 cases are neither authority for it or even guidance for Cartwright. Because Sherman 2 doesn't require a combination or conspiracy. The Cartwright Act absolutely requires a combination or conspiracy. While there's a lot of case law out there that says, oh, yes, the Cartwright Act came from Sherman. In fact, the California Supreme Court has said to the contrary, first in Texaco and in subsequent decisions, no, it didn't. It came from three separate state laws, Texas, Michigan, and one other that I can't remember at the moment. Do you have a case on the Cartwright Act that says that dangerous probability of success on the merits is not an element of an attempted monopolization claim? No, because all of the cases on the under. But that's your position, though, correct? That is my position because there is no California case that has ever adopted that position, California Supreme Court case that's ever adopted that position. And if you look at all the cases that Anger cited, it cited just a wealth of federal law to you because that's the only place they're going to find it because that's a Sherman analysis, not a Cartwright analysis, Your Honor. Well, now, you allege in the complaint at paragraph 108 that there was a dangerous probability of success of achieving monopoly power in the relevant market. That's one of your allegations. It is, Your Honor. But you can't prove it and you don't intend to prove it. It is unnecessary to prove it because, frankly, it is not California law. But when you drafted your complaint, you must have thought it was California law. That's true, Your Honor. Yeah. Well, how do we know it's not California law? Pardon me? We know it's not California law because there's no case holding it? Because if one looks at all of the cases that deal with attempt to monopolize under 720, none of those cases impose that standard. And Anger, I'm sure if it could find one, would have cited it. It can't either. It's simply not part of the standard. The standard is the very same standard that Qualamain puts forth. It's the standard that's found in Davis, where Davis was applying California law. It's the standard that's found in the TY, the Speedo case, TYR Sport case. Again, applying the Cartwright Act, California law, not applying federal law. Well, the TR Sport case does have a statement that plaintiffs need to allege facts demonstrating the defendant's conduct has an anti-competitive effect on the markets. That's a statement from that case. And I understand your contention to be that you don't have to show an anti-competitive effect on the markets. If Your Honor remembers, that case analyzed both Sherman and Cartwright analysis. That would be true of a ‑‑ certainly true of a Sherman, Sherman 1 analysis. But the case also went on to do a Cartwright analysis, Your Honor. I gather that the fact that this case involves something like a standard setting agency doesn't affect your analysis. You're not arguing for a per se rule or anything. I mean, in other words, in your view, the defendants used the standards, their influence on the standard setting agencies with regard to the coding issues to forward their concerns, but you didn't sue the agencies, and you're not arguing for any special standard as a result of that mode of impacting the market. Special standard, no, but if the Court looks at ASME, TYR Sport, and Davis, they are probably the three that are the closest. ASME and, you know, I mean, I think Justice Blackman, frankly, summed up our case. All you have to do is substitute names. Thus, M&M successfully used its position within ASME as an effort to thwart HydroLevel's competitive challenge. If you substitute Hanger, AOPA, and Daw, for the other three names, it comes out exactly the same way. What happened here? The issue in ASME was really dealing with something else. That was an issue about liability for the acts of one's agents and apparent authority. That's what was being discussed in that case. That is one of the issues that was being discussed, as well as whether a not-for-profit, standard-setting agency could be held liable for antitrust violation with the prospect even of punitive damages, but if one goes on and reads... But it dealt with agency law. I mean, the whole issue that was being discussed in that case was agency law. It wasn't the issue we had before us, correct? It is the issue you had before you, because the Court then went on to find not only were there, could it stand for antitrust violations, but it could as a result of agency. There's no question that the Court found that you can have antitrust violation by using a non-party, if you will, standard-setting agency as... But that's all that it decided. It didn't purport to be analyzing the type of facts that we have in this case and concluding that that was a violation.  As you have Asby there, as you have the use of the aegis of the Olympic Committee and who's going to get to go to Beijing, here you have the use of AOPA, which is again de facto a standard-setting body and the threat that eventually came out. If you use the microprocessor L code, you could be guilty of fraudulent billing, which for any prosthetist is probably... Nobody would do it. So you have in fact the same thing. In Asby what you had was if you use this particular hydro level, you won't be up, in essence, up to code. You will have failed one of the Asby standards for low-pressure boilers. But the thrust of my question was, does the fact that you're alleging a conspiracy essentially to use a standard-setting agency to create anti-competitive effects change what the ultimate purpose has to be? In other words, it's a methodology, but you still have, whatever restraint of trade means, you still have to prove it. That's correct, Your Honor. No, I don't believe it changes the standard. It does in turn a rule of reason, for example, analysis into a per se analysis just by virtue of using AOPA or Asby. So we still have the same problem, which is what does a purpose to restrain trade mean in this context? Right. And under Rule 56, are there sufficient facts from which a court can infer a purpose to restrain trade using infer as the equivalent decision of the California Supreme Court used it? And then just look at the findings that we've got. According to the district court, we were able to establish material issue of fact that Daw was, I'm sorry, Hanger was out to destroy Daw as a competitor. Hanger was making false statements about Daw that were malicious. It was engaged in a conspiracy, and it produced anti-competitive injury. Well, that's the last part seems to overlap the question of what is the ultimate. The problem we're struggling with, as I understand it, is what is the purpose that it has to have. And you're saying it doesn't have to have a purpose to do something that's dangerously likely to monopolize. So what purpose does it have to have? When you say anti-competitive injury, is not the same as an anti-competitive effect on the market altogether? I thought it basically is the same. I do not believe so, Your Honor. And I take that frankly, again, because under California law, all you have is 16720, which encompasses conspiracy, restraint of trade, and attempt to monopolize, and even monopolization. And they're all bundled right in there. We don't separate them out. I'm essentially asking the question that Judge Amon asked you. Are you saying that it's sufficient purpose to, it seems to me you are, simply that they were trying to get Daw out of this market? Yes. Period, the end. Without regard to whether Daw had any, whether they had any market power, whether Daw had any likelihood of actually having a significant share of the market, without regard to whether there were plenty of, let's suppose there were five other companies in the relevant market. None of that would matter. If there were, yeah, given the facts we have here, yes. And the reason is because of the pricing. As we know, the L code set the top price that the prostitutes is going to be able to get in reimbursement. So the prostitutes' decision has to be what's the best price I can get from the distributor, what it's going to cost me, assuming I can use the L code that will allow me the best price there at the top. Now, to take your honors hypothetically, let's assume there are five in the market, one of which is my client Daw. Daw, as you know from the undisputed facts, is selling to prostitutes at half, better than half, even with its discount from Ottobock, of what Hanger is. If you assume that the others are up selling to prostitutes in that range, then taking Daw out of the market would be a significant impact on competition because Daw is price competitive with the others. They could be Tweedledum, Tweedledee. Daw is price competitive. I think we really need to stop at this point, but you can answer one more question. To me, you just said that it has a significant effect in competition, so you're assuming that that's the ultimate standard. And this is what I've been trying to get you to deal with all along. What is the ultimate standard? And if we're going to say that it has to have a significant impact on competition, then without any expert evidence you just made a set of assertions about what would happen, but we don't know. Well, we do know what happened in this case. Yeah, we do know. Some other people came into the market. Not until 2004. So what? So what? That indicates that, in fact, the market, whatever the structure of this market was, it wasn't precluding competition. Okay. And that's, even if you apply a federal standard, that's the federal standard for attempt to monopolize, but it is not the standard for restraint of trade, the California standard for conspiracy and restraint of trade, Your Honor. It simply is not. Okay. Thank you very much. It was actually helpful, despite all the back and forth. You've been speaking for 25 minutes and 54 seconds. Actually, more than that. 30 minutes and 55 seconds. 30 minutes. You're right. Thank you. Good afternoon. May it please the Court. I'm Terry Anastasiou, Ropers, Majeski, Cohen, and Bentley. I'm here to talk to you on behalf of Hanger Orthopedic. Based on the tenor of the argument that just took place, I'm going to take a risk and be a little bit glib here, that antitrust violation lawsuits, they start out as a tort on the market. If you can prove a tort on the statutory, obviously, but a statutory tort on the market. If you can prove a tort on the market, then you are entitled to prove your own injury as a result of that injury to the market. But what if the district court didn't mean when he said that there was anticompetitive injury but not a sufficient showing of anticompetitive impact? I lost the last half. I'm sorry. As I understand what the district court said was that there was a showing of anticompetitive injury but not of anticompetitive impact sufficient to show a restraint of trade. Is that a good summary? Right. There was not a substantially adverse impact in the relevant market. Now, that's as to the specific restraint of trade claim. We have now that actual monopoly is out of the picture. We have a section 16-720 restraint of trade claim and an attempt to monopolize claim before the court. And the fact is that although the district court accepted that there was a tribal issue as to whether the evidence offered by DAW showed an injury to them, the court said that there was not a substantial adverse effect not evidence of a substantial adverse effect on the market. Now, that's, as the court has noted, that's shown by the fact that at the very time that DAW was supposed to be, I'm sorry, that Hanger was supposed to be acting in an anticompetitive sense, the market was expanding and market membership was expanding. And so that evidence is before the court, and we submit that that shows, that that justifies affirming summary judgment on that issue. When did the entry of individuals or companies come into the new market? The new ones? Yeah. What period of time did that happen? I believe that there was a company associated with DAW that came in in 2004. Then there was another in 2005. And, in fact, I believe that the expert who used the entry of, I'm sorry, the expert on behalf of Hanger, who used the entry of additional companies selling this sort of prosthesis as part of the analysis of competitive effect, I believe that he said that ultimately seven entered the market during the relevant period. Now, I think that that was, his relevant period was up to his analysis, which might have been in 2008. But the point is the anticompetitive effect, one of the essences of showing that, is showing a barrier to entry. And here we have the opposite being shown. Well, if I may respond to what I believe here, Mr. McIntyre is arguing. He would say, first of all, and I still don't fully understand this, but in fact the articulation of the anticompetitive effect standard from the case law doesn't apply to this. I don't know what he would say does apply to this, but he would say it doesn't apply to this. Well, as I understand it, the argument is that no California court has made that statement, has applied the standard. And in an attempt of monopoly situation, restraint of trade, there is a district court decision that we cite that applies to California. That's as far as I can take it. So therefore you have to tell us why we should accept that as the correct standard. Because without a significant effect on the market, there's no tort on the market. And all of these, all of the claims before you, it actually presents a nice opportunity to discuss the differences in what injury have to be shown in, and I trust, as the first two claims are, and then the trade libel claim, which ‑‑ Is there a difference between conspiracy to restrain trade and conspiracy to attempt to monopolize? I think attempt to monopolize is distinct from conspiracy to restrain trade. I apologize, but I don't understand the question. What does restrain trade mean, then, that's different? Restraint of trade, restraint of trade without the conspiracy is a party using the ‑‑ I'm saying with the conspiracy. With the conspiracy. With the conspiracy. That one or more, at least two businesses get together and use their market power to try and prevent other competitors from, another competitor or multiple competitors. So it's just a lesser version of attempt to monopolize, i.e., you still have to have an anti‑competitive effect, a substantial anti‑competitive effect in the relevant market, right? You would say that? Yes. All right. And so the difference is ‑‑ so attempt to monopolize is just harder because you have to show that the anti‑competitive effect is actually dangerously close to monopolizing. Right. So, in other words, we should just forget the attempt to monopolize because if they can show the first, they shouldn't have to show more than the first. Well, the restraint of trade claim, the district court granted on a ground that Hanger did not have sufficient power within the market to have an effect. Okay. And so the reason I'm arguing them separately is because I have separate bases on which to urge affirmance. But I agree that in both kinds of claims ‑‑ I'm sorry. I'm not understanding that. I'm trying to see how the pieces fit together here. If they didn't have sufficient power in the market, then there couldn't be an attempt to monopolize that would come to a dangerously close likelihood of monopolization, right? I don't know a situation in which a business without a substantial market position could attempt to monopolize. Right. All right. So it sounds like we should just forget about the attempt to monopolize. It doesn't add anything.  So we should just talk about the conspiracy to restraint. Right. All right. We have a ‑‑ we have testimony before the court. I shouldn't say testimony. We have evidence in the record that the market position of Hanger at the time all this was going on was 21 percent in 2006. There were three competitors by Dawes' own assertion, three competitors making different products but for the larger market. And then I was surprised to hear that the market we're talking about is the market created by the academy's ruling on L codes. You agree with him to that degree. The point is ‑‑ That's the market. The market is these microprocessors that are entitled to this L, whatever it is, code. The court looked at, the district court looked at the extent to which Hanger was present in the market and said that just isn't enough market power to go any further. And I would ask the court to accept that. I actually went looking for any decisions that would say, well, what is? And because the 20 to 21 percent, it struck me as being, certainly from Hanger's standpoint, that's a nice market position. You're in the market. Unless you have market power, is it your position that unless you have market power, you cannot engage in any activity that is a restraint of trade? You cannot be liable for engaging in activity that could be found to be an attempted restraint of trade. Well, is it that you can't effect a restraint of trade if you don't have market power? I suppose that's another way to put it. Yes, Your Honor. And I was talking about my attempt to find some sort of guidance on what is a sufficient market position. And I will say honestly that this decision is not in anybody's papers. And it's a Ninth Circuit decision. And if you don't want to hear about it, I won't put it before the court. But there is a thorough ---- Ordinarily you give us a little piece of paper and you say I'm going to cite this case. What? Ordinarily you would give us a little piece of paper telling us you're going to cite the case when you walk in and then we would know what you were talking about. Okay. I will do that next time. Well, hopefully next time I won't have ---- Go ahead. I won't be in a position where the decision hasn't been cited. So the point is that the district court made a finding, insufficient presence in the market to effect restraint of trade. And, you know, if you think about it, obviously there are things you can do that would constitute restraint of trade, arguably, that wouldn't be actionable because it wouldn't be a tort on the market. And if the courts have talked about what is and isn't sufficient, there's a decision before you, it might be Marsh, but honestly I'm drawing a blank, that says that 16% was not sufficient. You know, I'm not going to say to the court that there's any bright line here. But what we do have is we know that there was ---- a substantial fraction, but not a controlling, not a majority position in the market. And we know that other companies were entering the market so that we know that competition was still healthy. Now, unless the court wants me to address the trade libel cause of action or has any other questions, I'll submit. Thank you. I'm still fairly mystified about what the content of a restraint of trade violation is in California. In one word, I understand there's a list of factors, but none of them seem to include what you're saying is the tort on the market. So what is the definition of the relevant tort on the market? Well, the restraint of trade conspiracy claim, there has to be a conspiracy. The district court found there was a tribal issue about that. The conspiracy has to have committed wrongful acts. Again, the district court said tribal issue. The wrongful acts have been committed. Pardon? The wrongful acts in this instance being supposedly, I think, supposed lies or misrepresentations or whatever. Lies, misrepresentations, misuse of pricing combinations. There are a lot of different things that can be characterized as wrongful acts in the restraint of trade. Then they have to be shown to have been committed, carried out, with the purpose to restrain the trade. And the district court once again found that there was a tribal issue of that. And then the last thing is the injury. And this is where we hang up. Because the individual injury that has to be shown by a private party bringing a statutory restraint of trade claim is not the injury to them. It's the injury to the market. Marsh, a California telecourt decision we've cited, states that. The Caution decision, which is a district court case, but we state that, too. You show your individual injury to prove up your damages. But you don't get there unless you show the injury to the market. All right. Thank you for your attention. Thank you. All right. The matter is submitted. And the court will recess until 9 a.m. tomorrow morning.
judges: Amon, Pregerson, Berzon